UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| CHARLES A. CRAIG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| VAN P. SMITH, ONTARIO CORPORATION | ) | CASE NO. 1:06-cv-1792-DFH-DML |
| as the Plan Administrator, and | ) | |
| ONTARIO CORPORATION AND | ) | |
| AFFILIATES EMPLOYEE STOCK | ) | |
| OWNERSHIP PLAN, | ) | |
| | ) | |
| Defendants. | ) | |

FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff Charles Craig has sued defendants Van Smith, Ontario
Corporation, and the Ontario Corporation and Affiliates Employee Stock
Ownership Plan (ESOP) for alleged violations of the Employee Retirement Income
Security Act (ERISA), 29 U.S.C. § 1001 *et seq.* Craig retired from Ontario in
September 2001. At that time, Ontario and Craig arranged for Ontario to
purchase Craig's Ontario stock in return for promissory notes payable over ten
years. Ontario is a privately owned company; there is no ready market for its
shares. One of these notes was a ten-year note provided by Ontario in return for
Craig's Ontario shares that were held in his ESOP account. In early 2004, Ontario
stopped paying principal and then interest on the ESOP note. Craig eventually
sued Ontario on all the notes, including the ESOP note, and that lawsuit is
pending. In December 2006 Craig brought this lawsuit for violation of ERISA,

violation of the terms of the ESOP, and breach of fiduciary duty. The ESOP promissory note did not comply with the terms of ERISA or the ESOP, which required the note to be payable over no more than five years and to be supported by security. Craig's ERISA claims were tried to the court on November 18-19, 2008. Pursuant to Rule 52, the court enters these findings of fact and conclusions of law. Substance rather than the court's label shall govern whether a matter is treated as a finding of fact or conclusion of law. As detailed below, the court finds that the ESOP violated the terms of ERISA and the Plan document by giving Craig a promissory note payable over ten years, and that Ontario violated fiduciary duties that it owed to Craig by allowing the ESOP to violate ERISA in the transaction. The court also finds that Smith did not breach his personal fiduciary duties and that Craig is not entitled to attorney fees under ERISA.

I.      *Findings of Fact*

    A.      *Charles Craig*

Ontario Corporation hired Charles Craig as an accountant in November 1984. Craig retired in 2001. In 1995, Craig began to work for CDS Engineering, an Ontario subsidiary, as its treasurer. As treasurer of CDS, Craig's duties included the preparation of budgets and financial statements. At some point, Craig was also the assistant treasurer of Ontario. Craig was aware of the Ontario stock valuation process. Craig also had substantial information about CDS's and Ontario's financial health.

While he worked for Ontario and CDS, Craig accumulated Ontario shares and stock options. Craig held some Ontario shares in an ESOP account and held other shares directly. Craig's knowledge of the ESOP's terms was limited. He attended several annual ESOP informational meetings. He also had access to additional ESOP information, including the Plan document itself and the summary plan description. He also had access to other Ontario employees with knowledge of the ESOP's terms throughout his retirement negotiations. However, Craig did not take advantage of these opportunities. He first saw the Plan itself during depositions for this litigation, and he had never read the summary plan description. Although substantial information was available to Craig concerning the ESOP terms, he did not have actual knowledge of the ESOP's requirement that when an employee puts shares to the company, the put option notes must be paid over a maximum of five years and must be secured.

Craig began considering retirement from Ontario in April 1997, and he talked with Ontario president Kelly Stanley about retirement around the same time.[1] Most of Craig's retirement discussions were with Stanley. The two were and still are good friends. In 1999, Craig and Stanley agreed that Craig would retire at the end of June 2001. Through 1999 and 2000, Craig and Stanley occasionally discussed Craig's 2001 retirement. Craig also had discussions with

_____

[1]President Stanley was on the ESOP administrative committee with Ontario Vice President Jan Abbs and Ontario Treasurer John Martin. More on this below.

Ontario vice president and counsel Jan Abbs about how he could obtain value for his Ontario stock upon his retirement.

In 2000, as his planned retirement neared, Craig began to analyze the value of his stock options and shares, including his ESOP shares. Because Ontario shares were not publicly traded, their value typically was based on a private valuation that occurred twice a year, in June and December. Craig became aware of the December 31, 2000 valuation of Ontario's stock in March 2001. The valuation placed Ontario's stock at $50.88 per share. Ontario's share value had never been that high, and it has not been that high since. Craig was pleasantly surprised by this valuation.

After receiving the December 2000 valuation, Craig continued discussions with Stanley to formalize his retirement. Neither Stanley nor Abbs ever explained to Craig that the Plan required that any promissory notes issued when a participant exercised a put option for his Ontario shares had to be secured and payable over a maximum of five years.

Eventually, Stanley made a proposal to Craig. Stanley wanted Craig to remain with Ontario until the end of September 2001, at which point Craig could exercise all of his stock options and put his shares back to the company. Craig was willing to continue working until September, but he wanted the ability to put both the Ontario shares he owned and the shares he would receive by exercising

his options to the company at the December 31, 2000 valuation, which expired June 30, 2001.  Stanley told Craig that the company would purchase his ESOP shares at the December 31, 2000 valuation, but Stanley insisted that the company would buy the non-ESOP stock at the June 30, 2001 valuation.  Stanley did not change his previous assurances that Craig could use his Ontario stock to redeem his stock options and to pay the taxes due when he exercised his options, and that Craig could use the December 31, 2000 valuation for these redemptions.[2] However, he told Craig that the company would purchase his ESOP shares with a ten-year note, and he encouraged Craig to withdraw his shares and put them to Ontario quickly.  Craig never objected to the ten-year note or its security. Stanley hesitated to characterize his discussions with Craig as a "negotiation"; rather, it appears that Craig, Stanley, Abbs, and Martin attempted to reach a package resolution for the disposition of all of Craig's shares and options that was financially beneficial for Craig and feasible for Ontario.

After Craig's discussions with Stanley and Abbs, Abbs delivered the Ontario ESOP distribution forms packet to Craig.  Ex. 12.  Craig filled out the forms on April 11, 2001.  As Abbs instructed, Craig indicated on the forms that he was

---

[2]The evidence does not provide a precise timeline for Craig's meetings with Stanley and Abbs.  As the meetings occurred, Stanley, Abbs, and Martin discussed options for Craig's retirement among themselves.  The three were aware of the ESOP's limits on in-service withdrawals and the tension between this limit and permitting Craig to withdraw all of his ESOP stock before he actually retired. It appears that the three believed they were giving special treatment to Craig to permit him both to take advantage of the December 31, 2000 valuation and to continue to work until September 2001.

applying for an "in-service withdrawal on or after age 65." *Id.* The terms of Craig's retirement were laid out in a memorandum of understanding prepared by Ontario Treasurer John Martin based on what Stanley had told him. Ex. 9. Craig received the memorandum the day after applying for his ESOP shares, April 12, 2001. The memorandum included the terms that Craig had discussed with Stanley. The ESOP committee did not present the contents of the memorandum to defendant Smith or to the Ontario board of directors for their consent. The only information that the committee gave the board was a ledger showing stock transfers.

The memorandum confirmed that Craig would retire from Ontario on September 30, 2001. It stated that Craig would receive a distribution from the ESOP based on the December 31, 2000 valuation and that Craig "expressed the desire to exercise [his] right to put the shares acquired from the ESOP back to Ontario." Ex. 9. It continued: "If you exercise this right, you will accept a ten-year installment note." *Id.* The memorandum also explained that Craig would sell his non-ESOP Ontario shares to Ontario at the June 30, 2001 valuation. Craig discussed the memorandum with Martin and then signed it.

Craig received all 10,017 shares of Ontario stock from his ESOP account.[3] On May 8, 2001, he wrote a letter to Kelly Stanley to exercise his put option to sell the ESOP shares to Ontario at the December 31, 2000 price of $50.88 per share

---

[3]The Plan held primarily stock, but it reported the contents of participants' accounts by converting the stock to cash values.

for a total of $509,664.96.  Ex. 20.  The letter specified that Ontario would pay for the shares with a ten-year note.  *Id.*  Abbs directed Craig to write this letter.

On May 11, 2001, Ontario issued a promissory note to Craig for his ESOP shares.  Ex. 24.  In the note, Ontario Corporation (with president Kelly Stanley signing on its behalf) promised to pay Craig principal of $509,664.96 with interest over ten years in monthly installments consisting of principal and interest.  *Id.* The note included an acceleration clause:  "In the event of the failure to pay any installment of principal and interest within twenty (20) days after the due date thereof and ten (10) days next following Ontario Corporation's receipt of written notice of said failure to pay, the balance then due hereunder shall become immediately due and payable . . . ."  *Id.*  The note also provided that the debt to Craig would be subordinated to Ontario's other debts.  *Id.*

In the fall of 2000, Ontario's profits had begun to decline because its business was closely tied to the Silicon Valley semi-conductor industry, which suffered when the technology bubble burst.  As a result, Ontario eventually defaulted on the ESOP note.  It made its last principal payment on December 15, 2003 and its last interest payment on February 15, 2004.  In total, Ontario paid $169,336.49 on the ESOP note.  Ex. 90.  In July 2004, Craig agreed to delay the company's payments until December 2004.  He also agreed to subordinate the ESOP note to debts that Ontario owed to First Merchants Bank and the Van Smith family.  In January 2005, Craig had not received further payment on the ESOP

note, and he refused a request for a six month extension.  At that point, he and his wife commenced default proceedings against Ontario on all of the notes they had received in exchange for all of their shares, both in the ESOP and outside it. See *Craig v. Ontario Corp.*, 1:05-cv-861-LJM-JMS (S.D. Ind. filed June 8, 2005). These proceedings are now pending.[4]  On December 15, 2006, Craig filed this case.

B.    *Van Smith*

Defendant Van Smith and three colleagues purchased Ontario in 1956. Smith eventually became the majority shareholder of Ontario.  He was the chairman of the Ontario board of directors at all relevant times.  Smith and Craig had a business relationship but were not friends socially.

Smith was aware of the Ontario ESOP, but he was not involved in its management.  He never participated in the ESOP committee's meetings nor did he review any records from the meetings.  He never heard reports of any ESOP

---

[4]Judge McKinney entered judgment against Ontario in 2006.  *Craig v. Ontario Corp.*, 1:05-cv-861-LJM-JMS (S.D. Ind. Oct. 19, 2006) (Entry and Order of Judgment).  On appeal, Ontario raised a challenge to the court's subject matter jurisdiction based on an issue concerning Mr. and Mrs. Craig's citizenship.  The Seventh Circuit vacated the judgment and directed further proceedings on the issue of citizenship.  *Craig v. Ontario Corp.*, 543 F.3d 872 (7th Cir. 2008).  The note case is now back in the district court.  The timing of the judgment (before this case was filed) and the Seventh Circuit's remand (after this court had denied defendants' motion to dismiss this case) explains why these two cases were not consolidated.

problems.  He knew that an ESOP document existed, but he was not aware of its specifics.  He did not know the details of the ESOP's put option.

Smith had limited information about Craig's retirement.  In the time leading up to Craig's retirement, Smith was aware that Craig was planning to retire.  He also knew that Stanley, Abbs, and Martin were handling the details of Craig's retirement.  He never had any discussions with Stanley, Abbs, Martin, or others about the specifics of Craig's retirement agreement.  Smith was not involved in drafting the memorandum of understanding or Craig's other retirement documents.

C.    *The Ontario ESOP*

As discussed above, Ontario operates an employee stock ownership plan. ESOPs are federally regulated stock ownership plans designed to allow employees to invest in employer securities.  Charles Craig participated in the Ontario ESOP. The Plan designates Ontario as the Plan administrator.  Plan §§ 2.01(b), 8.01.[5] Ontario delegated its duties pursuant to Plan § 8.05.  The Ontario board approved a resolution at its May 1995 quarterly meeting appointing Jan Abbs, John Martin, and Kelly Stanley as an ESOP administrative committee "to carry out the duties of Ontario Corporation as Administrator of the ESOP in accordance with the terms of the Plan documents."  Ex. 43.  Van Smith was never a member of the ESOP committee.  The committee did not report on any regular basis to the corporation's board of directors.  The board had limited involvement with the committee, and it provided minimal oversight of the committee.  Apart from Craig's dispute, there do not appear to have been any major problems with the ESOP.  No witnesses reported complaints about the ESOP, and neither the Department of Labor nor the IRS ever investigated the ESOP.

_____

[5]The parties have provided the court with two Ontario ESOP documents. One of the documents purports to be "Restated as of July 1, 1995," Ex. 4, and the other document purports to be "Amended and Restated Generally Effective as of July 1, 2000."  Ex. 6.  The parties disputed which document is relevant to Mr. Craig's retirement, but the parties have identified no differences between the documents that are relevant to the issues in this case.  The court will cite the later document, Exhibit 6, in this Entry.

The Plan requires the ESOP to give members certain options for withdrawing value from their accounts. Two options are relevant to this case. One option is an "in-service withdrawal." Participants who are at least sixty-five years old and not retired can take an in-service withdrawal of up to $100,000. Plan § 6.13. Another option is to withdraw shares and to put them back to Ontario. When an employee retires, the Plan permits him to withdraw value from his account in cash or shares. Plan §§ 6.01, 6.04.

An employee who withdraws shares under any of these circumstances may then put the shares back to Ontario. The put option provides in relevant part:

> A Participant . . . shall have the right to require the Company to purchase any Employer Stock distributed to the Participant . . . under the Plan ("put option"). . . . The put option is exercised by the holder notifying the Employer and the Trustee on the Applicable Form that the put option is being exercised. The purchase price at which the put option is exercisable is the fair market value of the Employer Stock as determined under Section 11.03. If the holder of the put option notifies the Employer . . . that he desires to exercise such put option, the Plan may assume the rights and obligations of the Employer at the time the put option is exercised. At the election of the Employer, payment . . . may be made in a lump sum or, if otherwise permitted by ERISA and Code Section 409(h), in deferred installments. Any installment payment shall provide for a reasonable rate of interest, and as security for such installment payments, the holder of the put option shall be given a promissory note which provides that it shall become due and payable in full if the purchaser defaults in payment of any installment payment. . . . The payment period for such installments may not end more than five (5) years after the date the put option is exercised.

Plan § 12.01(a)-(c). Section 11.03 provides that the value of stock is the value:

> as of the most recent Valuation Date; unless the Administrator believes that the value as of the most recent Valuation Date is significantly more than the

fair market value of such Employer Stock as of the date of the transaction, in which case, the value of the Employer stock shall be, if permitted under ERISA, the value of such Employer Stock determined as of the date of such transaction.

Plan § 11.03(b).  The requirements of the put option are at the center of this case.

II.     *Conclusions of Law*

The court has federal question jurisdiction because the claims arise under 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).  Craig states two claims.  First, he states a claim under 29 U.S.C. § 1132(a)(1)(B) for Plan benefits against Ontario and the ESOP.  Second, he states a claim under 29 U.S.C. § 1132(a)(3)(B) for breach of fiduciary duty against Ontario and Smith.  Craig also seeks attorney fees and costs from all defendants.  See 29 U.S.C. § 1132(g)(1).

A.     *Claim for Benefits Under ERISA*

Craig brings his first claim under 29 U.S.C. § 1132(a)(1)(B), which permits a participant or beneficiary to bring civil actions "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  Craig claims that the ESOP and Ontario, as plan administrator, violated the Internal Revenue Code and the Plan when Ontario paid Craig with the ten-year note that had inadequate security.  The court finds that the ESOP violated the Plan when it did

not provide Craig with a put option that complied with the Plan and the Internal Revenue Code.[6]

Both the Internal Revenue Code and the ESOP require that Ontario ESOP participants have the ability to exercise a put option that meets certain standards when they receive distributions in the form of company stock.  The Code says that if the employer's stock is "not readily tradable on an established market" (and Ontario stock has not been traded publicly), the participants must have "a right to require that the employer repurchase employer securities under a fair valuation formula."  26 U.S.C. § 409(h)(1)(B).  This requirement can be satisfied only if:

> (A) the amount to be paid for the employer securities is paid in substantially equal periodic payments (not less frequently than annually) over a period beginning not later than 30 days after the exercise of the put option described in paragraph (4) and not exceeding 5 years, and
> (B) there is adequate security provided and reasonable interest paid on the unpaid amounts referred to in subparagraph (A).

26 U.S.C. § 409(h)(5); see also 29 C.F.R. § 2550.408b-3(l)(4) (put option payment provisions must include adequate security and a payment period of not more than five years).

---

[6]The ESOP, not Ontario, is liable on Count I.  Craig seeks to hold Ontario liable as the plan administrator, but Craig did not explain how a plan administrator that has delegated authority is liable for the acts of the Plan under 29 U.S.C. § 1132(a)(1)(B).  Craig developed the retirement agreement with the ESOP.  The ESOP committee members decided how the ESOP shares would be put to Ontario and how Ontario would pay for the shares.  As discussed below, Ontario is liable under § 1132(a)(3)(B) for breach of fiduciary duty by virtue of its failure to monitor the ESOP committee, but it is not directly liable under § 1132(a)(1)(B) for the ESOP's underlying failure to comply with the Plan.

The Plan's requirements track those of the Code.  The Plan permits the employer to pay the purchase price of stock in a lump sum or in deferred installments consistent with 26 U.S.C. § 409(h).  The deferred installments may not last more than five years.  Plan § 12.01(c).  The Plan also requires, as security for installment payments, "a promissory note which provides that it shall become due and payable in full if the purchaser defaults in payment of any installment payment."  *Id.*

Because 29 U.S.C. § 1132(a)(1)(B) focuses on the "terms of the plan," the critical determination is whether Ontario and the ESOP violated the Plan terms.  The Plan requires the put option to comply with § 409(h).  The Plan and § 409(h) contain the same five-year note requirement.  They also both contain a security requirement.  While § 409(h) does not define "adequate security," the Plan requires more specifically "a promissory note which provides that it shall become due and payable in full if the purchaser defaults in payment of any installment payment" as security.  The parties debate whether the ESOP note contains adequate security under the IRC and interpretations of the IRC, but the security requirement and the cause of action for breach of the security requirement are both rooted in the Plan.  The Plan incorporates the IRC, but the IRC is vague on this point while the Plan is specific.  The terms of the Plan govern.  The ESOP note is sufficiently secured if it complies with the Plan's requirement that it "shall become due and payable in full if the purchaser defaults in payment of any installment payment."

The ESOP note issued to Craig complied with the Plan's security requirement because it contained an acceleration clause requiring full payment in the event of default.  Ex. 24.  The ESOP note did not comply with the Plan's five-year requirement.  The ESOP provided for Craig to receive a ten-year note to pay for the shares that he put to Ontario.[7]  This ten-year note violated the Plan terms.  The ESOP is liable to Craig for benefits that he lost as a result of receiving a ten-year note rather than a five-year note.

Defendants offer two reasons that the ESOP should not be held to the terms of the Plan.  These reasons are not sufficient to excuse the ESOP from complying with the Plan.  First, defendants argue that Craig waived his right to a ten-year note by negotiating an individual retirement deal outside the scope of the Plan that covered both his ESOP shares and his non-ESOP shares and stock options.  Defendants point out that Craig's ESOP distribution occurred before he actually retired and was for much more than the $100,000 ceiling on in-service distributions.  The argument is not persuasive.  The court assumes that Craig and the committee could have decided voluntarily to depart from the Plan terms, the record shows they did not do so here.  The participant and administrator did not bargain around the Plan.

---

[7]The defendants state correctly that a participant is not required to exercise the put option.  A participant may choose, for whatever reason, to hold employer securities that are not traded on a market.  However, this hold option does not eliminate the requirement that the ESOP give employees a put option with a five-year payment and security.  The ESOP did not provide this option to Craig.

To waive rights under ERISA, a plan participant must do so knowingly.  See *Sharkey v. Ultramar Energy Ltd.*, 70 F.3d 226, 231 (2d Cir. 1995) (reversing summary judgment for defendants; waiver of ERISA pension and severance benefits is valid only if the waiver is "knowing and voluntary"), quoting *Laniok v. Advisory Committee of Brainerd Mfg. Co. Pension Plan*, 935 F.2d 1360, 1368 (2d Cir. 1991); *Smart v. Gillette Co. Long-Term Disability Plan*, 70 F.3d 173, 181-82 (1st Cir. 1995) (waiver of ERISA rights must be "knowing and voluntary," and courts must "scrutinize an ostensible waiver with care in order to ensure that it reflects the purposeful relinquishment of an employee's rights"); accord, *Melton v. Melton*, 324 F.3d 941, 945-46 (7th Cir. 2003) (stating that one standard for a beneficiary's valid waiver of ERISA benefits is that waiver must be "explicit, voluntary, and made in good faith"), quoting *Manning v. Hayes*, 212 F.3d 866, 874 (5th Cir. 2000).

The Second Circuit has identified several factors courts should consider in evaluating purported waivers of ERISA rights, including the plaintiff's education, business experience, and sophistication, the parties' roles in deciding the final terms of the arrangement, the agreement's clarity, the time available to the plaintiff to study the agreement, whether the plaintiff had independent advice in signing the agreement, and the nature of consideration offered in exchange for the waiver.  See *Finz v. Schlesinger*, 957 F.2d 78, 82 (2d Cir. 1992); *Smart v. Gillette Co. Long-Term Disability Plan*, 70 F.3d at 181 n.3 (First Circuit treating Second Circuit's list as helpful rather than conclusive).  The decisive factor here is the

agreement's lack of clarity.  There is no indication in the signed memorandum that Craig was giving up his right under the Plan to a note payable over no more than five years.  Defendants suggest that Craig should have known he was waiving that right, based on evidence that he had access to information detailing the five-year note requirement.  The evidence shows, however, that Craig did not actually know of the requirement.  The document did not warn Craig that he was waiving that right.[8]  No member of the ESOP committee informed Craig orally of his right to a five-year note.  There was no explicit agreement by Craig that he was negotiating an agreement outside of the Plan.  Accordingly, Craig did not knowingly bargain around or waive his Plan rights.

Second, defendants argue that Craig was deprived of no Plan benefits because the entire package that he negotiated with Ontario was exceptionally favorable to him.  The defendants are correct that Craig, Abbs, and Stanley formed an agreement that gave Craig a favorable valuation on his ESOP shares and obligated Ontario to purchase all of his non-ESOP shares, which Ontario was not required to do.  The agreement that Craig received appears more favorable than that received by many other Ontario employees.  The argument has some equitable force, but despite Ontario's apparent generosity, the ESOP remained bound by the terms of the Plan.  ERISA was enacted to provide protections for

---

[8]The memorandum, which the defendants assert proves that Craig waived any rights he had under the Plan, shows only that Ontario required Craig to accept a ten-year payment.  See Ex. 9 ("You have expressed the desire to exercise your right to put the shares acquired from the ESOP back to Ontario.  If you exercise this right, you will accept a ten-year installment note.").

employees.   While the committee members may have thought that they were helping Craig through this agreement, they insisted that he accept a risk (the ten-year note) that harmed Craig significantly.  They did not obtain a valid waiver of Craig's rights under the Plan.  ERISA does not excuse the violation of Plan terms because of good intentions.

B.   *Claim of Breach of Fiduciary Duties*

Craig brings his second claim under 29 U.S.C. § 1132(a)(3)(B), which provides a civil cause of action for participants, beneficiaries, or fiduciaries "to obtain other appropriate equitable relief" to redress violations of ERISA or the Plan.  Craig alleges that Smith and Ontario violated their fiduciary duties under ERISA.  To prove this claim, the plaintiff must establish:  "(1) that the defendants are plan fiduciaries; (2) that the defendants breached their fiduciary duties; and (3) that the breach caused harm to the plaintiff."  *Jenkins v. Yager*, 444 F.3d 916, 924 (7th Cir. 2006), quoting *Brosted v. Unum Life Ins. Co. of America*, 421 F.3d 459, 465 (7th Cir. 2005).

1.   *Fiduciary Status*

ERISA defines a fiduciary as follows:

a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or

> other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A).  A party's status as a fiduciary is not determined by a rigid formula.  Rather, the court looks to the extent that Ontario and Smith exercised control or authority over the management or administration of the ESOP.  See *Ruiz v. Continental Casualty Co.*, 400 F.3d 986, 990 (7th Cir. 2005).  The result of this inquiry is that both Ontario and Smith are fiduciaries of the Plan for some purposes.

### a.  *Ontario Corporation*

The Plan defines Ontario as the ESOP Administrator.  Plan § 2.01(b).  The Plan provides that the Administrator "shall have the authority to control and manage the operation and administration of the Plan and shall be the named fiduciary of the Plan."  Plan § 8.01(a).  As the Administrator of the Plan, Ontario is a fiduciary.  See 29 C.F.R. § 2509.75-8 (D-3).

The Plan allows Ontario to delegate fiduciary responsibilities to new fiduciaries.  Plan § 8.05.  When Ontario delegates fiduciary responsibilities, it is not liable for the new fiduciary's acts or omissions except as ERISA provides.  Plan § 8.05.  Ontario delegated its responsibilities to the ESOP committee of Stanley, Abbs, and Martin.  Ex. 43.  ERISA permits this delegation, but the delegation does

not absolve Ontario of all responsibility.  See 29 U.S.C. § 1105(c)(1).  Ontario remains liable as a fiduciary insofar as its actions permitted the ESOP committee to breach its fiduciary duties.  29 U.S.C. § 1105(a)(2), (c)(2)(B); see also 29 U.S.C. § 1105(c)(2)(A)(iii) (appointing fiduciary remains responsible for "continuing the allocation or designation").  This remaining liability is consistent with ERISA's flexible definition of fiduciary, which provides that an entity is a fiduciary only "to the extent" of its authority.  See 29 U.S.C. § 1002(21)(A).

In the Seventh Circuit, corporations that select administrators retain fiduciary duties.  In *Leigh v. Engle*, 727 F.2d 113 (7th Cir. 1984), the court found that a fiduciary corporation that indirectly appointed an administrative committee retained fiduciary duties.  In that case, defendant Engle controlled corporate defendant Libco, which owned 100% of Reliable Manufacturing.  Reliable Manufacturing's board, in turn, had authority to appoint and remove retirement plan administrators.  Engle and Libco had substantial control over the plan administrators whom Reliable Manufacturing had chosen.  The court held that Engle and Libco had a fiduciary duty "to the extent that they performed fiduciary functions in selecting and retaining plan administrators."  727 F.2d at 133.

Ontario was responsible for selecting and retaining Abbs, Martin, and Stanley as ESOP committee members.  Ontario could delegate responsibility for the day-to-day management of the ESOP, but it remained a fiduciary of the ESOP

by virtue of its appointment authority.  The scope of Ontario's duty is discussed
further below.

> b.    *Van Smith*

As chairman of the Ontario board of directors, Smith had a fiduciary duty
to act prudently in selecting and retaining the members of the ESOP committee.
ERISA regulations provide:

> Members of the board of directors of an employer which maintains an
> employee benefit plan will be fiduciaries only to the extent that they have
> responsibility for the functions described in section 3(21)(A) of the Act.  For
> example, the board of directors may be responsible for the selection and
> retention of plan fiduciaries.  In such a case, members of the board of
> directors exercise "discretionary authority or discretionary control
> respecting management of such plan" and are, therefore, fiduciaries with
> respect to the plan.  However, their responsibility, and, consequently, their
> liability, is limited to the selection and retention of fiduciaries . . . .

29 C.F.R. § 2509.75-8 (D-4).  Smith is a fiduciary and had fiduciary duties
respecting the selection and retention of members of the ESOP committee.

> 2.    *Breach of Fiduciary Duties*

The second step in the ERISA fiduciary duty inquiry is to determine whether
the defendants breached their fiduciary duties.  ERISA provides in part:

> a fiduciary shall discharge his duties with respect to a plan solely in the
> interests of the participants and beneficiaries and –
>      . . .

(B)    with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

. . .

(D)    in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III of this chapter.

29 U.S.C. § 1104(a).  These duties are rooted in the common law of trusts, though the Supreme Court has described the comparison as "problematic" because the common law assumes that a trustee "wears only his fiduciary hat when he takes action to affect a beneficiary, whereas the trustee under ERISA may wear different hats."  *Pegram v. Hedrich*, 530 U.S. 211, 225 (2000).

As the Plan Administrator, Ontario breached its fiduciary duties by failing to monitor the ESOP committee.  One of the members of the committee, Kelly Stanley, was Ontario's President, and he knew the ESOP was not complying with the Plan.  Smith did not breach his fiduciary duties, however, because his actions relating to the selection and retention of committee members were prudent, and because he knew nothing of the violation of the Plan terms.

a.    *Ontario Corporation*

Ontario was required to oversee the ESOP committee.  ERISA regulations direct that fiduciaries that appoint other fiduciaries have a continuing responsibility to oversee the appointed fiduciaries.  29 C.F.R. § 2509.75-8 (FR-17)

("At reasonable intervals the performance of . . . fiduciaries should be reviewed by the appointing fiduciary in such manner as may be reasonably expected to ensure that their performance has been in compliance with the terms of the plan and statutory standards . . . ."). Case law confirms that delegating fiduciaries retain a duty to monitor the fiduciaries who receive delegations of authority. See *Leigh*, 727 F.2d at 135 (defendants who selected close business associates as plan administrators had a duty to monitor the administrators' actions); *Howell v. Motorola, Inc.*, 337 F. Supp. 2d 1079, 1097-99 (N.D. Ill. 2004) (denying dismissal of ERISA claim that director defendants had a fiduciary duty to monitor committee members).[9]

Ontario did not oversee the ESOP committee in a manner that lived up to its fiduciary duties. The president, vice president, and treasurer of Ontario were members of the ESOP committee. These members all knew that the ESOP was not complying with the Plan or statute when it approved the ten-year note to Craig. The ESOP committee members cannot simply forget the information they

---

[9]The defendants submitted a supplemental pre-trial memorandum listing authorities that stand for the proposition that Ontario and Smith, as fiduciaries, had no duty to provide information to Craig about the put option because the put option was described in the Plan. *E.g.*, *Chojnacki v. Georgia-Pacific Corp.*, 108 F.3d 810 (7th Cir. 1997); *Schmidt v. Sheet Metal Workers' Nat'l Pension Fund*, 128 F.3d 541 (7th Cir. 1997); *Kamler v. H/N Telecomm. Servs., Inc.*, 305 F.3d 672 (7th Cir. 2002); *Vallone v. CNA Financial Corp.*, 375 F.3d 623 (7th Cir. 2004). If the plaintiff were bringing a breach of fiduciary duty claim against the ESOP committee members, these cases could be relevant. However, the plaintiff's claim (at least the claim that this court accepts) is that Ontario failed to monitor the ESOP. That ERISA fiduciaries have no duty to inform plan participants of information that is contained in plan documents is not relevant to the issue of whether an ERISA plan administrator effectively monitored a plan committee.

obtain as ESOP committee members when they are acting as corporate officers. Though Ontario's fiduciary duties were narrower than the ESOP committee members' duties, Ontario violated its fiduciary duty to monitor the ESOP committee when Ontario officers knew of the Plan's non-compliance and took no action to correct it.

b.     *Van Smith*

Smith did not violate his fiduciary duty to act prudently in selecting and retaining ESOP committee members.  Smith had no involvement with the ESOP committee and no knowledge of the details of the Craig transaction.  Additionally, the plaintiffs presented no evidence of a systemic ESOP compliance problem that should have come to the attention of Smith.  Smith's fiduciary duty to the Plan was narrow.  He did not violate this duty by failing to question the ESOP committee members about this particular transaction when he had no knowledge of any problems with the ESOP.

3.     *The Breach of Fiduciary Duty Harmed Craig*

The final prong of the Seventh Circuit's fiduciary duty test requires Craig to show that the breach of fiduciary duty harmed him.  *Jenkins*, 444 F.3d at 928. Craig has made this showing.  Ontario's lack of oversight of the ESOP committee permitted the committee to approve a ten-year note instead of a five-year note. This ten-year note, in turn, led Craig to receive less money than he would have

received from a five-year note.  Craig was injured by Ontario's breach of fiduciary duty.  The damage is the difference between what Ontario paid on the ten-year note and what it would have paid on a five-year note if it had ceased payment at the same time.

### 4.   *Statute of Limitations*

The defendants contend that Craig's breach of fiduciary duties claim is barred by the ERISA statute of limitations.  Answer 8.  In relevant part, ERISA provides that no action for breach of fiduciary duty may be brought "after the earlier of"

> (1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation, or
> (2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation[.]

29 U.S.C. § 1113.  The defendants contend that Craig had actual knowledge of Ontario's fiduciary duty violations in May 2001, which is more than five years before he brought his fiduciary claims in December 2006.

Actual knowledge is not constructive knowledge.  For Craig to have actual knowledge of an ERISA violation, "it is not enough that he had notice that something was awry; he must have had specific knowledge of the actual breach of duty upon which he sues."  *Martin v. Consultants & Administrators, Inc.*,

966 F.2d 1078, 1086 (7th Cir. 1992), quoting *Radiology Center, S.C. v. Stifel, Nicolaus & Co.*, 919 F.2d 1216, 1222 (7th Cir. 1990).  However, "it is not necessary for a potential plaintiff to have knowledge of every last detail of a transaction, or knowledge of its illegality" because "the relevant knowledge for triggering the statute of limitations is knowledge of the *facts* or *transaction* that constituted the alleged violation."  *Martin*, 966 F.2d at 1086.

The Seventh Circuit has cautioned that the determination of "actual knowledge" in the ERISA context is particularly difficult:

> We know that somewhere between "every last detail" and "something was awry" lies the requisite knowledge of an ERISA violation. The proper characterization will usually turn in part on the complexity of the underlying factual transaction, the complexity of the legal claim and the egregiousness of the alleged violation. Beyond such generalizations, however, we can only say that judges, faced with particular contexts and relying on their "situation sense," must make the determination.

*Id.*

In *Martin*, the Seventh Circuit provided guidance.  The case was a civil enforcement suit brought by the Department of Labor.  One of the claims was for breach of fiduciary duty against fund trustees for failing to take steps to recover kickbacks.  These kickbacks had been paid to other fund trustees who were convicted of criminal charges before the Department brought the civil suit.  The Department knew that the remaining trustees had not brought a suit to recover the kickbacks more than three years before the Department brought its fiduciary

claims.  *Id.* at 1089.  However, the Seventh Circuit held that ERISA's three-year statute of limitations did not bar the Department's claim because the statute of limitations on the remaining trustees' underlying claim to recover the kickbacks expired less than three years before the Department brought its claim.  The court said:  "it is not until the trustees' delay in bringing suit has precluded (or at least prejudiced) their ability to recover that the [Department] has a claim – and hence knowledge of a violation."  *Id.*

In this case, Craig did not have a claim until Ontario defaulted on the ESOP note.  No harm had occurred until that point, and harm is an element of a fiduciary violation.  Until the default, Craig reasonably expected to be paid on the ten-year note, which, because of interest payments, was not of less value than a five-year note.  The court assumes that Craig could have sought to reform the note before the default, but the statute of limitations for breach of fiduciary duty did not begin to run until the default actually caused Craig harm.  A five-year note and a ten-year note had the same value due to interest payments until it was clear that Ontario could not complete payments on the ten-year note.  Craig was harmed only when Ontario defaulted on the note in January 2004, and that is the date when he had actual knowledge of his claim.[10]  Craig brought his fiduciary

---

[10]Ontario missed its first principal payment in January 2004, and it missed its first interest payment in March 2004.  Ex. 90.

duty claim on December 15, 2006, which is within three years of his knowledge of the violation.[11]

### III.   *Attorney Fees*

Craig also seeks attorney fees.  Under ERISA, "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1).  In the Seventh Circuit "there is a 'modest presumption' in favor of awarding fees to the prevailing party, but that presumption may be rebutted."  *Stark v. PPM America, Inc.*, 354 F.3d 666, 673 (7th Cir. 2004), quoting *Senese v. Chicago Area I.B. of T. Pension Fund*, 237 F.3d 819, 826 (7th Cir. 2001). In determining whether to award fees and costs, the Seventh Circuit has often

---

[11]The defendants' best case is *Librizzi v. Children's Memorial Medical Center*, but it does not require a contrary result.  134 F.3d 1302 (7th Cir. 1998).  In that case, Librizzi, an employee of Children's Hospital Medical Center, filed an ERISA fiduciary suit in April 1996 claiming that his employer gave him inaccurate information in 1990 about disability benefits that caused him to elect early retirement benefits instead of regular retirement benefits.  Librizzi claimed that his early retirement benefits election cost him money because, once he reached the regular retirement benefits eligibility age, his payments were lower because he elected early benefits.  He argued that the statute of limitations should not have begun to run until Children's Hospital stopped negotiating with him about amending his benefits.  The Seventh Circuit rejected his argument.  "An adverse decision whose effect is deferred gives rise to a claim when the decision is made, not when the effect is felt."  *Id.* at 1306.  The court said that the critical date was October 1991, when "he learned . . . that he could have done better financially . . . ."  *Id.* at 1307.  Of course, financial loss is part of a breach of fiduciary duty claim, so actual knowledge of financial loss is required to begin the statute of limitations.  Even though he did not feel the effect of the adverse decision until a later date, Librizzi knew in October 1991 that he would receive less money overall. Craig, on the other hand, did not have knowledge that he would receive less money until Ontario stopped payment on the note.

said that there is one fundamental consideration:  "was the losing party's position substantially justified and taken in good faith, or was that party simply out to harass its opponent?"  *Stark*, 354 F.3d at 673, quoting *Bowerman v. Wal-Mart Stores, Inc.*, 226 F.3d 574, 593 (7th Cir. 2000).  Accord, *Sullivan v. William A. Randolph, Inc.*, 504 F.3d 665, 671-72 (7th Cir. 2007) (explaining that "substantial justification" test is proper method for determining whether to award ERISA attorney fees).

Craig's request for attorney fees is denied.  The court has discretion to award or deny attorney fees, and it believes that the defendants' positions in this litigation were substantially justified.  Ontario was attempting to help Craig in his retirement, and it approved a generous comprehensive package of benefits for him.  As explained above, the court does not believe it can overlook the failure to comply with the Plan, at least in the absence of a valid waiver by Craig.  But the ESOP Committee and Ontario reasonably believed that the comprehensive package they put together was more generous to Craig than strict adherence to all Plan terms would have been.  In exercising discretionary judgment as to whether to award fees, the court finds that these unusual circumstances weigh against a fee award.

IV.    *Equitable Relief*

On the benefits claim under 29 U.S.C. § 1132(a)(1)(B), the Ontario ESOP is liable under ERISA for benefits that Craig did not receive as a result of receiving

a ten-year note rather than a five-year note.[12]   On his breach of fiduciary claim against Ontario, the court may award "other appropriate equitable relief" to redress violations of ERISA or an ERISA plan.   29 U.S.C. § 1132(a)(3)(B). Individual plaintiffs can seek individual recovery against fiduciaries under § 1132(a)(3)(B).  *Varity Corp. v. Howe*, 516 U.S. 489, 515 (1996).  However, not all forms of relief are available under the subsection.   Only "other appropriate equitable relief," which refers to "categories of relief that were *typically* available in equity," is available under § 1132(a)(3)(B).  *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 256 (1993).  The court has discretion to fashion an appropriate equitable remedy.

The most appropriate remedy for Craig to redress Ontario's fiduciary violations is to reform the ESOP note and require Ontario to pay Craig as if Ontario had issued a five-year note.[13]   Therefore, the remedies for the § 1132(a)(1)(B) claim and the § 1132(a)(3)(B) claim result in Craig receiving the

---

[12]This measure for relief is less than and legally and logically distinct from damages that Craig may recover from Ontario in the other action for default on the note that was actually issued.  The defendants argue that the Plan required only that the ESOP distribute stock to Craig.  According to the defendants, this means that money damages are not a proper remedy.  The court disagrees.  Plan § 12.01 gave Craig the right to put his shares to the company.  Even though the company had to pay for the shares, the ESOP had to ensure that the put option was exercised properly.  It did not do so in this case, so the ESOP is liable for benefits that Craig would have received if it had followed the Plan.

[13]The defendants did not argue that the relief that Craig seeks under § 1132(a)(3)(B) violates that subsection's requirement that relief be equitable. Because the defendants did not raise the issue and because case law on the legal/equitable distinction in the ERISA context is uncertain, the court has exercised its discretion to fashion an equitable remedy.

same amount of money. While the ESOP is primarily liable, the court has good reason to believe that Craig will not be able to recover from the ESOP, so Ontario is also liable as a fiduciary. See *Varity Corp.*, 516 U.S. at 515 ("we should expect that where Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief, in which case such relief normally would not be 'appropriate'"). Ontario and the ESOP are jointly and severally liable. For damages purposes, the court assumes that Ontario would have defaulted on the five-year note on the same date that it defaulted on the ten-year note. The parties supplied evidence showing that Ontario paid Craig $169,336.49 on the ESOP note before the default. Ex. 90. The parties did not supply evidence showing how much Ontario would have paid Craig on a five-year note if Ontario had defaulted on the same date as it defaulted on the ten-year note. (Craig argued for a different measure of relief.) Without this information, the court cannot determine an appropriate measure of relief. The court directs the parties to file supplemental information on this question within fourteen days of this entry. Finally, the court notes that ERISA plan fiduciaries are not guarantors of all plan obligations. The problem in this case, however, is that the fiduciaries followed a deliberate course in violation of the Plan terms that caused harm to Craig.

V.    *Conclusion*

Plaintiff is entitled to a judgment in his favor against the Ontario ESOP for benefits under the Plan and against Ontario for breach of fiduciary duties. Ontario and the ESOP are jointly and severally liable for these benefits. Defendant Smith is entitled to judgment on the claim against him. After receiving the parties' calculations on the difference between a five-year note and the ten-year note, judgment will be entered consistent with this entry.

So ordered.

Date: January 26, 2009

_____
DAVID F. HAMILTON, CHIEF JUDGE
United States District Court
Southern District of Indiana

Copies to:

Mark J. R. Merkle
KRIEG DEVAULT LLP
mmerkle@kdlegal.com

Stacy Walton Long
KRIEG DEVAULT LLP
slong@kdlegal.com

Andrew W. Hull
HOOVER HULL LLP
awhull@hooverhull.com

Don R. Hostetler
HOOVER HULL LLP
dhostetler@hooverhull.com

Laurie E. Martin
HOOVER HULL LLP
lmartin@hooverhull.com